**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN MARKS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| NEON THERAPEUTICS, INC., CARY PFEFFER, ROBERT BAZEMORE, ROBERT KAMEN, ERIC LANDER, HUGH O'DOWD, STEPHEN SHERWIN, ROBERT TEPPER and MERYL ZAUSNER, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Case No.  1:20-cv-03033

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**JURY TRIAL DEMANDED**

Plaintiff John Marks ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**<u>NATURE OF THE ACTION</u>**

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Neon Therapeutics, Inc. ("Neon" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants" and, together with Neon, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") between Neon and BioNTech SE ("BioNTech").

2.      On January 15, 2020, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand

to receive 0.063 American Depository Shares ("ADR") of BioNTech for each share of Neon stock they own (the "Merger Consideration"). Upon completion of the merger, Neon shareholders will own approximately 0.85% and BioNTech shareholders will own approximately 99.15% of the combined company.

3.     On April 1, 2020, in order to convince Neon shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form F-4 (the "F-4") Registration Statement with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.  The materially incomplete and misleading F-4 violates SEC Rule 14a-9 (17 C.F.R. § 240.14a-9). The Board has scheduled a special meeting of the Company's shareholders on May 4, 2020 to vote on the Proposed Transaction.

4.     While touting the fairness of the Merger Consideration to the Company's shareholders in the F-4, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the F-4 materially incomplete and misleading.

5.     In particular, the F-4 contains materially incomplete and misleading information concerning: (i) the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that Neon shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by Neon's financial advisor, Duff & Phelps, LLC ("Duff & Phelps") in support of its opinion that the Merger Consideration is fair to shareholders, on which the Board relied.

6.     It is imperative that the material information that has been omitted from the F-4 is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Transaction.

7.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of: (i) Regulation G (17 C.F.R. § 244.100); and (ii) Rule 14a-9 (17 C.F.R. § 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to Neon shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

9.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because a substantial portion of the alleged wrongs took

place in this District and the Company's common stock trades on the NASDAQ Composite, which

is headquartered in this District.

## PARTIES

11.    Plaintiff is, and at all relevant times has been, a holder of Neon common stock.

12.    Defendant Neon is incorporated in Delaware and maintains its principal executive

offices at 40 Erie Street, Suite 110, Cambridge, Massachusetts 02139. The Company's common

stock trades on the NASDAQ under the ticker symbol "NTGN."

13.    Individual Defendant Cary Pfeffer is Neon's Chairman and has been a director of

Neon at all relevant times.

14.    Individual Defendant Robert Bazemore is Neon's President and Chief Executive

Officer and has been a director of Neon at all relevant times.

15.    Individual Defendant Robert Kamen has been a director of Neon at all relevant

times.

16.    Individual Defendant Eric Lander has been a director of Neon at all relevant times.

17.    Individual Defendant Hugh O'Dowd has been a director of Neon at all relevant

times.

18.    Individual Defendant Stephen Sherwin has been a director of Neon at all relevant

times.

19.    Individual Defendant Robert Tepper has been a director of Neon at all relevant

times.

20.    Individual Defendant Meryl Zausner has been a director of Neon at all relevant

times.

21.     The Individual Defendants referred to in paragraphs 13-20 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Neon (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

23.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable. As of March 26, 2020, there were approximately 29,000,000 shares of Neon common stock outstanding, held by hundreds of individuals and entities scattered throughout the country. The actual number of public shareholders of Neon will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii)     whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the F-4 in violation of Section 14(a) of the Exchange Act;

iii)    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv)    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading F-4.

c.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.    A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**I.      The Proposed Transaction**

24.      Neon is a clinical-stage immune-oncology company and a leader in the field of neoantigen-target therapies, dedicated to transforming the treatment of cancer by directing the immune system towards neoantigens.

25.      On January 16, 2020, Neon and BioNTech issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

> MAINZ, Germany and CAMBRIDGE, Mass., Jan. 16, 2020 (GLOBE NEWSWIRE) -- BioNTech (Nasdaq: BNTX, "BioNTech") and Neon Therapeutics, Inc. (Nasdaq: NTGN, "Neon") today announced that they have entered into a definitive merger agreement under which BioNTech will acquire Neon in an all-stock transaction valued at approximately $67.0 million. Neon is a biotechnology company developing novel neoantigen-based T cell therapies. Upon closing, it will operate as a subsidiary of BioNTech, a global clinical-stage biotechnology company focused on patient-specific immunotherapies for the treatment of cancer and other serious diseases. The transaction will combine two organizations with a common culture of pioneering translational science and a shared vision for the future of cancer immunotherapy.
>
> "This acquisition fits with our strategy to expand our capabilities and build our presence in the U.S. and further strengthens our immunotherapy pipeline," said Ugur Sahin, MD, Co-founder and CEO of BioNTech. "I am particularly excited about the adoptive T cell and neoantigen TCR therapies being developed by Neon, which are complementary to our pipeline and our focus on solid tumors."
>
> "We are very proud of all we have accomplished since we founded Neon and look forward to joining forces with BioNTech to continue to build a business that provides life-changing immunotherapy products to patients battling a variety of cancers," said Hugh O'Dowd, Chief Executive Officer of Neon.
>
> Neon has deep expertise in the development of neoantigen therapies, with both vaccine and T-cell capabilities. Neon's most advanced program is NEO-PTC-01, a personalized neoantigen-targeted T cell therapy candidate consisting of multiple T cell populations targeting the most therapeutically relevant neoantigens from each patient's tumor. Neon is also advancing a precision T cell therapy program targeting shared neoantigens in genetically defined patient populations. The lead program from this approach, NEO-STC-01, is a T cell therapy candidate targeting shared RAS neoantigens. In addition, Neon has assembled libraries of high-quality TCRs against various shared neoantigens across common HLAs.

Neon's pipeline is underpinned by its platform technologies including RECON®, its machine-learning bioinformatics platform, and NEO-STIM™, its proprietary process to directly prime, activate and expand neoantigen-targeting T cells ex vivo.

**Transaction Details**

Under the terms of the definitive agreement, Neon will, following consummation of the acquisition, merge with Endor Lights, Inc., a Delaware corporation and a direct, wholly-owned subsidiary of BioNTech and become a wholly-owned subsidiary of BioNTech. At closing, BioNTech will issue, and Neon shareholders will receive 0.063 American Depositary Shares (ADS) (each ADS representing one ordinary share of BioNTech) in exchange for each of their shares of Neon. The exchange ratio implies a deal value of $67 million, or $2.18 per share of Neon, based on the closing price of BioNTech's ADSs of $34.55 on Wednesday, January 15th, 2020.

The transaction was unanimously approved by both BioNTech's and Neon's boards of directors. The transaction, which is expected to close during the second quarter of 2020, is subject to approval of Neon's shareholders and the satisfaction of customary closing conditions. Certain stockholders of Neon owning approximately 36% of the outstanding Neon shares have entered into voting agreements, pursuant to which they have agreed, among other things, and subject to the terms and conditions of the agreements, to vote in favor of the Neon acquisition.

Ondra Partners is acting as the exclusive financial advisor to Neon and Goodwin Procter LLP is acting as legal counsel to Neon. Duff & Phelps LLC provided a fairness opinion to Neon's board of directors in connection with the transaction. Covington & Burling LLP is acting as legal counsel to BioNTech.

**About BioNTech**

BioNTech was founded in 2008 on the understanding that every cancer patient's tumor is unique and therefore each patient's treatment should be individualized. Its cutting-edge pipeline includes individualized mRNA-based product candidates, innovative chimeric antigen receptor T cells, novel checkpoint immunomodulators, targeted cancer antibodies and small molecules. BioNTech has established relationships with seven pharmaceutical collaborators, including Eli Lilly and BioNTech, Genmab, Sanofi, Bayer Animal Health, Genentech, a member of the Roche Group, Genevant and Pfizer, and has published over 150 peer-reviewed publications on its scientific approach.

For more information, please visit www.BioNTech.de.

**About Neon**

Neon is a biotechnology company developing novel neoantigen-targeted T cell therapies, dedicated to transforming the treatment of cancer by directing the immune system towards neoantigens. Neon is using its neoantigen platform to develop both personal and precision neoantigen-targeted T cell therapy candidates. Neon's most advanced program is NEO-PTC-01, its personalized neoantigen-targeted T cell therapy candidate consisting of multiple T cell populations targeting the most therapeutically relevant neoantigens from each patient's tumor.

For more information, please visit www.neontherapeutics.com.

26.      Neon is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders.  It is imperative that Defendants disclose the material information they have omitted from the F-4, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

27.      If the false and/or misleading F-4 is not remedied and the Proposed Transaction is consummated, Defendants will directly and proximately have caused damages and actual economic loss (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## II.      The Materially Incomplete and Misleading F-4

28.      On April 1, 2020, Defendants caused the F-4 to be filed with the SEC in connection with the Proposed Transaction.  The F-4 solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the F-4 before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the F-4 misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed

- 9 -

decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### The Materiality of Financial Projections

29.     A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the F-4 discloses that "in connection with the exploration of strategic alternatives as described in this proxy statement/prospectus, including the proposals from BioNTech, Neon management prepared certain non-public, unaudited projections of financial performance for Neon for the fiscal years ending December 31, 2020 through 2044, or the Management Projections, based on its view of the prospects of Neon, and risk-adjusted these projections for Neon's principal programs consisting of (i) Neon's two lead T cell programs, NEO-PTC-01, or PTC, and NEO-STC-01, or STC, and, together with PTC, the T cell Therapies, and (ii) Neon's two vaccine programs, NEO-PV-01, or PV, and NEO-SV-01, or SV, and, together with PV, the Vaccines." F-4 210. The F-4 also discloses projections for the fiscal years ending December 31, 2045 through 2050, which represent extrapolations by Duff & Phelps. *Id.*

30.     When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101).  Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions.  In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K.  *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

31.     Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are

presented in an appropriate format." 17 C.F.R. § 229.10(b). Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items." 17 C.F.R. § 229.10(b)(2).

32.     In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

> (i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*
>
> (ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

33.     Here, Neon's shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that the Board specifically relied on the financial forecasts in reaching its decision to, among other things, approve the Merger Agreement and the transactions contemplated by it. F-4 208-09.

34.     As discussed further below, the non-GAAP financial projections used do not provide Neon's shareholders with a materially complete understanding of the assumptions and key

factors considered in developing the financial projections, which assumptions, factors and other inputs the Board reviewed.

### *The Financial Projections Relied on by the Board*

35.     The F-4 discloses that "in connection with the exploration of strategic alternatives as described in this proxy statement/prospectus, including the proposals from BioNTech, Neon management prepared certain non-public, unaudited projections of financial performance for Neon for the fiscal years ending December 31, 2020 through 2044, or the Management Projections, based on its view of the prospects of Neon, and risk-adjusted these projections for Neon's principal programs consisting of (i) Neon's two lead T cell programs, NEO-PTC-01, or PTC, and NEO-STC-01, or STC, and, together with PTC, the T cell Therapies, and (ii) Neon's two vaccine programs, NEO-PV-01, or PV, and NEO-SV-01, or SV, and, together with PV, the Vaccines." *Id.* at 210. The F-4 also discloses projections for the fiscal years ending December 31, 2045 through 2050, which represent extrapolations by Duff & Phelps. *Id*

36.     The F-4 goes on to disclose, *inter alia*, Neon's forecasted values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics for 2020 through 2050 for (1) EBITDA, (2) Earnings Before Interest and Taxes, (3) Net Operating Profit After Tax, and (4) Free Cash Flow, but fails to provide (i) the line items used to calculate these non-GAAP metrics or (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures. *Id.* at 213.

37.     The F-4 defines EBITDA as "Neon's earnings before interest, taxes, depreciation and amortization and excluded stock-based compensation expense." *Id.* at 213 n.1. Nevertheless, the F-4 fails to reconcile EBITDA to its most comparable GAAP measure or disclose the line items used to calculate EBITDA, rendering the F-4 materially false and/or misleading. *Id.* at 213.

38.     The F-4 defines Free Cash Flow as "Neon's free cash flow before interest payments and is calculated as earnings before interest, taxes, depreciation and amortization, less capital expenditures, less increases in net working capital and less tax expense." *Id.* at 213 n.2. Nevertheless, the F-4 fails to reconcile Free Cash Flow to its most comparable GAAP measure or disclose the line items used to calculate Free Cash Flow, rendering the F-4 materially false and/or misleading.  *Id.* at 213.

39.     The F-4 fails to define Earnings Before Interest and Taxes, reconcile Earnings Before Interest and Taxes to its most comparable GAAP measure or disclose the line items used to calculate it, rendering the F-4 materially false and/or misleading. *Id.*

40.     Similarly, the F-4 fails to define Net Operating Profit After Tax, reconcile Net Operating Profit After Tax or disclose the line items used to calculate it, rendering the F-4 Materially false and/or misleading. *Id.*

41.     Thus, the F-4's disclosure of these non-GAAP financial forecasts provides an incomplete and materially misleading understanding of the Company's future financial prospects and the inputs and assumptions for which those prospects are based upon.  It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

42.     The non-GAAP financial projections disclosed on page 213 of the F-4 violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G as a result of Defendants' failure to reconcile those non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC

Regulation 14a-9 because they are materially misleading as without any correlation with their GAAP equivalent financial metrics, shareholders are unable to discern the veracity of the financial projections.

43.     As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisors.

### The Financial Projections Violate Regulation G

44.     The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[3]

45.     Defendants must comply with Regulation G.  More specifically, the company must disclose the most directly comparable GAAP financial measure and a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures

---

[1]     Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).

[2]     Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[3]     SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan. 22, 2003), *available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").

. . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[4]

46.     Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5]   Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Neon included in the F-4 here) implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.   And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.   I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.   I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

47.     The SEC has required compliance with Regulation G, including reconciliation

---

[4]     SEC, *Final Rule.*

[5]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[6]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

requirements in other merger transactions. *Compare Youku Tudou Inc., et al.*, Correspondence to SEC 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination),[7] *with Youku Tudou Inc., et al.*, SEC Staff Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Correspondence to SEC 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[9]

48.     Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a). Thus, in order to bring the F-4 into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

---

[7]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm.

[8]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf.

[9]     *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/filename1.htm. *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures. Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/000000000010060087/filename 1.pdf. *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4. The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov/Archives/edgar/data/789132/000000000017025180/filename1.pdf.     The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions, which reflect the SEC's official position. Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such as the Proposed Transaction is incorrect. The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G. The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on. *See* www.sec.gov/divisions/corpfin/cfguidance.shtml (last visited Apr. 15, 2020).

***The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9***

49.    In addition to the F-4's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts disclosed materially misleading as shareholders are unable to understand the differences between the non-GAAP financial measures and their respective most comparable GAAP financial measures. Nor can shareholders compare the Company's financial prospects with similarly situated companies.

50.    Such projections are necessary to make the non-GAAP projections included in the F-4 not misleading for the reasons discussed above.  Indeed, Defendants acknowledge that "[n]on-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP, and non-GAAP financial measures as used by Neon may not be comparable to similarly titled amounts used by other companies."  F-4 212.

51.    Additionally, the failure to provide any projected financial information relating to BioNTech is materially misleading because the Merger Consideration is being paid in 100% BioNTech stock. Shareholders are being asked to give up their shares of the Company without being provided the necessary information required to determine how attractive BioNTech stock is. Therefore, shareholders are being materially mislead about the value of the consideration.

52.    As such, financial projections are plainly material, and shareholders would clearly want a complete and non-misleading understanding of those projections.

53.    In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on page 213, Defendants must provide a reconciliation

table of the non-GAAP financial measures to the most comparable GAAP measures and disclose projected financial information for BioNTech.

### *The Materially Misleading Financial Analyses*

54.     The summary of the valuation methodologies utilized by Duff & Phelps, including the utilization of certain of the non-GAAP financial projections described above by Duff & Phelps, in connection with its valuation analyses (*id.* at 214-15) is misleading in violation of Regulation 14a-9.  The opacity concerning the Company's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently.  Once an F-4 discloses internal projections relied upon by the Board, those projections must be complete and accurate.

55.     With respect to Duff & Phelps's fairness opinion generally, the fairness opinion does not perform any valuation analyses on BioNTech. This is materially misleading because 100% of the Merger Consideration is being paid in BioNTech stock. Failure to provide valuations analyses on BioNTech misleads shareholders into believing that the Merger Consideration represents a static price, and overstates the attractiveness of the Merger Consideration. Therefore, the failure to disclose any valuation analyses of BioNTech is materially misleading shareholders regarding the attractiveness of the Merger Consideration.

56.     With respect to the Company's additional financial advisor, Ondra Partners ("Ondra"), the F-4 fails to disclose the amount Ondra has been paid, or will be paid, for its services, the size of Ondra's success fee, any past relationships between Ondra and Neon or BioNTech and its associates or the timing, nature and amount paid for any past services performed for Neon or BioNTech.

57.     Therefore, in order for Neon shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

58.     In sum, the F-4 independently violates both: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to its most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the F-4 independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the F-4 to garner votes in support of the Proposed Transaction from Neon shareholders.

59.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

60.     Further, failure to remedy the deficient F-4 and consummate the Proposed Transaction will directly and proximately cause damages and actual economic loss to shareholders (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)**

61.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

62. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any [F-4] or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

63. As set forth above, the F-4 omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a). SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most comparable" GAAP measure. 17 C.F.R. § 244.100(a).

64. The failure to reconcile the non-GAAP financial measures included in the F-4 violates Regulation G and constitutes a violation of Section 14(a).

65. As a direct and proximate result of the dissemination of the false and/or misleading F-4 Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT II

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

66.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

67.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9(a).

68.     Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

69.     Defendants have issued the F-4 with the intention of soliciting shareholder support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the F-4, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

70.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were

misstated or omitted from the F-4 but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

71.     The Individual Defendants knew or were negligent in not knowing that the F-4 is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

72.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the F-4, rendering the sections of the F-4 identified above to be materially incomplete and misleading.

73.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the F-4.  The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the F-4 or failing to notice the material omissions in the F-4 upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

74.     Neon is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the F-4.

75.     The misrepresentations and omissions in the F-4 are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

76.     As a direct and proximate result of the dissemination of the false and/or misleading

F-4 Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT III

**(Against the Individual Defendants for Violations
of Section 20(a) of the Exchange Act)**

77.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

78.     The Individual Defendants acted as controlling persons of Neon within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of Neon, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the F-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

79.     Each of the Individual Defendants was provided with or had unlimited access to copies of the F-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

80.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act

violations alleged herein and exercised the same.  The F-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing the F-4.

81.     In addition, as the F-4 sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The F-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

82.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

83.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the F-4;

C.      Directing Defendants to account to Plaintiff and the Class for all damages sustained

as a result of their wrongdoing and to award damages arising from proceeding with the Proposed

Transaction;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' and expert fees and expenses; and

E.      Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  April 15, 2020

Respectfully submitted,

**FARUQI & FARUQI, LLP**

By:  _/s/ James M. Wilson, Jr._

Nadeem Faruqi
James M. Wilson, Jr.
685 Third Avenue, 26th Floor
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
Email: nfaruqi@faruqilaw.com
          jwilson@faruqilaw.com

_Counsel for Plaintiff_